People of the State of Illinois, Defendant in Error, v. Perry Elbert Walker and George Walker, Plaintiffs in Error.

Gen. No. 50,262.

First District, First Division.

June 4, 1965.

Edward R. Conroy, of Chicago, for plaintiff in error.

William G. Clark, Attorney General, of Springfield (Daniel P. Ward, State's Attorney of Cook County, Fred G. Leach and George W. Kenney, Assistant Attorneys General, Elmer C. Kissane and William J. Nellis, Assistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE MURPHY delivered the opinion of the court.

Defendants, Perry Elbert Walker and George Walker, brothers, were tried jointly upon charges of

conspiracy and confidence game. Both charges were grounded upon fictitious injury claims made to an insurance company. A jury found them guilty of both charges. Perry received a $2,000 fine and a two to five year term for the conspiracy charge and a concurrent four to eight year term for the confidence game charge. George received concurrent one to two-year terms upon both charges.

Defendants' writ of error was transferred by the Illinois Supreme Court to this court for disposition. Defendants contend that "the obtaining of insurance proceeds by false representation does not constitute the crime of confidence game" and that the record does not support a conviction on either charge.

In substance, the evidence shows that on June 20, 1960, Perry Walker suggested a deliberate automobile collision to Frank McCauley, Jr., Bill Swain and George Walker. On June 21, the four entered Perry's 1947 DeSoto to accomplish their objective, and later, while proceeding on Western Avenue, the Walker automobile was struck from behind by an automobile driven by one Frank Wirth.

A police squadrol arrived on the scene, and the officers were informed that no one was injured. The drivers exchanged identification information, including insurance data, and all left the scene of the occurrence. On the morning of June 22, 1960, Wirth telephoned his insurer (Allstate Insurance Company) and reported the collision. On the same morning, Perry Walker, George Walker, Bill Swain and Frank McCauley met at a tavern, and after some conversation with Perry, Willie Stevens, the bartender, agreed to take the place of "another boy that was in the accident with us," who had to go to work.

Perry then drove the DeSoto and his four companions to the Allstate Insurance Company's Chatham office, located at 87th Street and Stony Island Avenue

180

in Chicago. Perry entered the office and reappeared with an Allstate property damage adjuster, who made an estimate of the amount of damage. Thereafter, at about 1:00 p. m., Perry Walker, George Walker and the three others entered the Allstate office and talked with Robert Samardick, an Allstate adjuster.

Samardick had a conversation with all five regarding the occurrence. He was told by each of them that "they were injured as a result of this accident . . . and they stated they were not working this day, they were attempting to settle the claim. . . . Mr. Walker, who was employed by the Anniston Soil and Pipe Company told me that he was en route back to his home and waiting for the settlement to take the airplane back." He offered "$25 to each individual as a means of settling the claim for the personal injuries involved." This offer was refused, and "the demand made by the gentlemen was $150 for each person, plus the property damage to the car. I told them I could not offer this amount of money, my top offer would be $100 for each individual plus the property damage to the car." It was on this basis that the claims were settled. "I then made out the drafts to the five people and I gave each individual a draft for $100, with the exception of the driver of the car, Mr. Perry Walker. His draft was for $151.25. This included the damage to the car." Each of the five individuals executed a release in his presence and, in return, he handed each of them a draft for the agreed amount. After identification, the releases and drafts were received in evidence.

Samardick further testified, "I relied upon the fact that our assured had reported he was in an accident and from my determination of the facts, our assured was liable. And I relied upon the fact that the individuals stated that they were injured as a result of the accident, and this was the reason I paid them."

181

After leaving the Allstate office, the five went down the street to a currency exchange and, using a business card of Samardick, the endorsed drafts were exchanged for cash. The drafts were ultimately charged against an Allstate bank account. After receiving currency for the drafts, they drove back to 61st and Prairie Avenue and, while in the car, and at the instructions of Perry, "they each kept the $50 and gave Perry the rest of the money that was left, and we all got out of the car and went back to the corner."

The five claimants were jointly indicted upon charges of a confidence-game conspiracy, a confidence-game acquisition, and a false-pretense acquisition. In the jury trial of Perry and George Walker, the prosecution witnesses included two of their coindictees—Frank McCauley, Jr., and Willie Stevens. They both testified in detail as to the series of events and their own participation. Both defendants testified and denied that the occurrence was planned.

The contentions of defendants are: (1) "The settled law of the State of Illinois is that the obtaining of insurance proceeds by false representation does not constitute the crime of confidence game"; (2) "Where property or money is obtained by unlawful means other than by fraudulently obtaining the confidence of the victim and abusing the confidence so obtained, a conviction of the crime of Confidence Game cannot stand"; and (3) "There is no evidence in the record to prove the crime of conspiracy to obtain property by means of Confidence Game as charged in the indictment."

The statutory provision relating to the crime of confidence game (Ill Rev Stats 1959, c 38, § 256) reads as follows:

"Every person who shall obtain or attempt to obtain from any other person or persons any money, property or credit by means or by use of any false or bogus check or by any other means,

182

instrument or device commonly called the confidence game shall be imprisoned in the penitentiary not less than one year nor more than ten years."

To support the contention that obtaining insurance proceeds by false representations does not constitute the crime of confidence game, defendants cite People v. Peers, 307 Ill 539, 139 NE 13 (1923), and People v. Ingravallo, 309 Ill 498, 141 NE 176 (1923). In the Peers case, Peers was involved in an automobile collision at a time he had no insurance on his car. With the collusion of the insurer's agent, he purchased a policy and made a fraudulent claim, representing that the loss occurred after the policy was purchased. In stating that "a swindling operation does not constitute the confidence game unless the element of confidence is present," the court said (p 543) :

"There is no element of confidence in the transaction involved in this case unless it might be said that Peers had confidence in Potter. Insurance companies do not pay claims because they have confidence in the insured. They pay them because the insured brings his claim within the terms of the insurance contract by the proof submitted. The transaction is wholly impersonal and the relation is purely contractual. The object of the provisions of the insurance contract requiring the insured to submit himself to an examination is to enable the insurer to possess itself of all knowledge and all information as to other sources of knowledge of facts material to its rights, to enable it to determine its obligation and to protect itself against a false claim."

In the Ingravallo case, defendants attempted to obtain life insurance proceeds by representing the death of the insured, and the court said (p 499) :

183

"The element of confidence reposed by the victim in the swindler and betrayed is essential to the confidence game, and there is no such element in this case. The obtaining of money from an insurance company by a false representation of the facts as to the company's liability does not constitute obtaining money by means of the confidence game . . . ."

■ We are not convinced the foregoing pronouncements in the Peers and Ingravallo cases are determinative here. At the outset, "it is no bar to a prosecution for the crime of confidence game that the victim is either a public or private corporation, and the suggested technical distinction is without merit." (People v. Epping, 17 Ill2d 557, 568, 162 NE2d 366 (1959).) In the Peers case, it is said (p 542):

"The confidence game statute was designed to reach that class of offenders known as 'confidence men,' who practice swindling schemes as various as the mind of man is suggestive, upon unwary victims. The gist of the crime is the obtaining of the confidence of the victim by some false representation or device. . . . It covers any scheme whereby a swindler wins the confidence of his victim and then swindles him of his money or property by taking advantage of the confidence fraudulently obtained. If the transaction is, in fact, a swindling operation, it is immaterial that the form assumed is that of a lawful business transaction. . . . But a swindling operation does not constitute the confidence game unless the element of confidence is present. . . . It is not enough to show that there has been an obtaining of money by false pretenses."

■ We believe the essential "element of confidence" is present here. Both defendants, together with

184

their three companions, presented themselves at Allstate, and all five were personally interviewed by Samardick, and their false representations of injury were accepted and acted upon by him. He testified, "I relied upon the fact that the individuals stated that they were injured as a result of the accident, and this was the reason I paid them." We think this is ample demonstration of confidence reposed by him in the swindlers. This was the gist of the crime—"the obtaining of the confidence of the victim by some false representation or device. . . . If the transaction is, in fact, a swindling operation, it is immaterial that the form assumed is that of a lawful business transaction." Allstate paid for releases which were based on a swindle and on false representations of injury made to its agent, Samardick, and money was obtained by the defendants "by taking advantage of the confidence fraudulently obtained." People v. Peers, 307 Ill 539, 542, 139 NE 13.

■ To support defendants' second contention that "where property or money is obtained by unlawful means other than by fraudulently obtaining the confidence of the victim and abusing the confidence so obtained, a conviction of the crime of Confidence Game cannot stand," defendants cite, in addition to the Peers and Ingravallo cases, People v. West, 406 Ill 249, 93 NE2d 370 (1950); People v. Bischoff, 319 Ill 262, 149 NE 756 (1925); People v. Gould, 363 Ill 348, 2 NE2d 324 (1936), and others. Primarily, these cases grew out of regular business dealings and carry the pronouncements made in People v. West, at page 251. The rule is that "in order to constitute the crime of confidence game it is necessary that there be more than confidence reposed in the swindler. Where the confidence of the injured party is honestly obtained through the course of regular business dealings and the one in whom the confidence is reposed breaches

185

that confidence to the injury of the one reposing it, the statute defining and punishing the confidence game is not violated." These cases are not in point here. The instant case was a swindling operation from the beginning and did not grow out of "regular business dealings." We conclude the record sustains the conviction of both defendants for confidence game.

■ Finally, defendants contend "there is no evidence in the record to prove the crime of conspiracy to obtain property by means of Confidence Game as charged in the indictment." Cited are People v. Hodson, 406 Ill 328, 94 NE2d 166 (1950); People v. Braun, 375 Ill 284, 31 NE2d 287 (1940); and People v. Walsh, 322 Ill 195, 153 NE 357 (1926). In the Hodson case, the court said (p 340):

> "To justify the conclusion that a conspiracy existed, there must be evidence of some agreement or some joint action toward accomplishing the object of the conspiracy."

In the Braun case, the court said (p 288):

> "To support an indictment for conspiracy it is not necessary to prove an agreement in express terms. The existence of a conspiracy can be shown by the conduct of the parties and other circumstances which disclose that the accused persons, either by acting together or separately, pursued a course tending to accomplish a common, unlawful design."

In the Walsh case, it is said (p 207):

> "[A] charge of conspiracy against a number of individuals must be proved as laid and against all the parties as charged, and a conspiracy against a single person cannot be sustained by proof of a conspiracy against the public generally."

186

 We believe the pronouncements in the Hodson and Braun cases, as applied to the evidence here, support the convictions of conspiracy. There was both an agreement and "joint action toward accomplishing the object of the conspiracy." We are not persuaded that the pronouncements in the Walsh case apply here. Although the indictment did particularize the Allstate Insurance Company as the victim, the crime of conspiracy had been concluded before the initial communication with the insurer. It was sufficient to show an unlawful combination to obtain the money or property of any person belonging to the class known as the public. (People v. Smith, 239 Ill 91, 107, 87 NE 885 (1909).) The reference in the indictment to Allstate Insurance Company and its property "might be regarded as mere surplusage." (People v. Rogers, 303 Ill 578, 583, 136 NE 470 (1922).) "The essence of the offense is not the accomplishment of the unlawful object, but it is the unlawful combination or agreement to accomplish the criminal or unlawful purpose. It is unnecessary to prove any overt act toward the accomplishment of the unlawful purpose. The offense is complete when the agreement is made although no act is done toward carrying it into effect." (People v. Blumenberg, 271 Ill 180, 184, 110 NE 788 (1915).) The specific victim of the conspiracy at the moment of the agreement was unknown to the conspirators, but it was intended to be "any person belonging to the class known as the public." Therefore, Allstate fitted the description of the intended victim of the conspiracy, and we believe that a charge of conspiracy against a single person can be sustained by proof of a conspiracy against the public generally. We conclude the evidence in the record sustains the conviction of both defendants of the crime of conspiracy as charged in the indictments.

187

For the reasons given, the judgments against both defendants are affirmed.

Affirmed.

BURMAN, P. J. and KLUCZYNSKI, J., concur.